[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
Before this Court for decision are pre-trial motions filed by defendants Robert Picerno and Jonathan Oster by which they seek to suppress from their respective trials the electronic wiretap surveillance evidence garnered by the State.[1] Defendants argue, in support of their request for suppression of the wiretap evidence, that the State violated the Rhode Island Wiretap Statute, R.I. Gen. Laws §§ 12-5.1-1 et seq., by (1) failing to establish probable cause and necessity for the authorized interceptions; (2) failing to properly minimize the interception of non-pertinent conversations during execution of the wiretap orders; (3) disclosing the wiretap evidence through the process of discovery in the criminal case; and (4) failing to properly seal and store certain of the wiretap recordings. The State has objected to the defendants' motions.
For the reasons set forth in this decision, this Court denies the defendants' motions to suppress to the extent they are premised on claims of lack of probable cause and necessity for the court-authorized interceptions, failure to minimize non-pertinent conversations and unlawful disclosure of wiretap evidence. It reserves decision with respect to the question of whether suppression is warranted for alleged sealing and storage violations, pending an evidentiary hearing.
 I. FACTS AND TRAVEL
In late 2001 and early 2002, the Attorney General for the State of Rhode Island sought authorization from the Presiding Justice of the Rhode Island Superior Court for the State Police to intercept the telephone conversations of defendant Picerno. On November 16, 2001, the Attorney General filed an application with the Presiding Justice, pursuant to the Rhode Island Wiretap Statute, R.I. Gen. Laws § 12-5.1-2, for an order authorizing members of the State Police to intercept communications over a Sprint PCS wireless cellular telephone being used by defendant Picerno ("Sprint 113"). That application incorporated by reference an extensive forty-page affidavit of Detective Brian Casilli that detailed the facts and circumstances underlying the State's request for the wiretap authorization.[2]
On that same date, the Presiding Justice signed an order authorizing the interception of telephone communications requested in the application and affidavit for no longer than 30 days. (WT-2001-08). In that order, the Presiding Justice found, as required by the Rhode Island Wiretap Statute, R.I. Gen. Laws §12-5.1-4(a)(1)(4), that: (1) there was probable cause to believe that defendant Picerno and other unknown persons have committed, are committing or are about to commit the crimes of extortion, solicitation or acceptance of a bribe, and conspiracy to commit those crimes; (2) there was probable cause to believe that communications concerning those offenses would be obtained through the requested wiretap; (3) normal investigative procedures reasonably appear unlikely to succeed if tried; and (4) there was probable cause to believe that the facilities from which, or the place where, the wire electronic or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of those offenses. The order authorized the interception of communications that were for the purpose of committing the designated offenses and that would identify any co-conspirators, accomplices and agents of defendant Picerno. The order mandated that the application and order be sealed by the Presiding Justice and stored in a safe deposit box at his direction. It also required that weekly reports be filed with the Presiding Justice to show the progress made toward achievement of the stated objectives of the wiretap and to demonstrate the need for continued interception to gather further evidence of the designated offenses.
On December 14, 2001, the Attorney General filed an application with the Presiding Justice for an order extending the November 16, 2001 wiretap authorization order until December 22, 2001. That application incorporated by reference the earlier Casilli affidavit, dated November 16, 2001, as well as a supplemental forty-page affidavit from Detective Casilli that was dated December 14, 2001. The later Casilli affidavit detailed much of the pertinent information gathered as a result of the initial wiretap. On December 14, 2001, the Presiding Justice granted the State's extension request and issued an order, similar to that issued in connection with the first wiretap application, that authorized extension of the wiretap on defendant Picerno's cellular telephone until December 22, 2001.
As the State believed that defendant Picerno would be on vacation in Florida for an extended period of time, it did not seek to extend Sprint 113 beyond December 22, 2001 and allowed it to expire. Discovery filed by the State in these criminal cases indicates that the State Police filed detailed weekly reports regarding the progress of this wiretap with the Presiding Justice, kept detailed monitoring logs regarding its interceptions (that were introduced into evidence at the suppression hearing), and documented the chain of custody regarding the tapes comprising Sprint 113. The parties do not dispute that these tapes were sealed and stored by the State in accordance with the directions of the Presiding Justice.
On January 18, 2001, the State filed another wiretap application, together with a thirty-page affidavit from Detective Casilli (that detailed much of the pertinent information garnered as a result of the extension of the initial wiretap) and copies of his two prior affidavits. It obtained another order from the Presiding Justice (Acting) authorizing it to intercept communications over defendant Picerno's same Sprint cellular telephone for a maximum of 30 days ("Sprint 114").
On January 28, 2002, the Presiding Justice issued an order that authorized the State Police to intercept communications over defendant Picerno's home telephone for a maximum of twenty days. (WT 2002-02). This order was issued based on the State's application and submission of the three prior Casilli affidavits and his new eleven-page affidavit that detailed the evidence gathered from the renewed wiretap on defendant Picerno's cellular telephone. ("Verizon 115").[3]
On February 15, 2001, the Presiding Justice extended the wiretap authorized on January 18, 2001 with respect to defendant Picerno's cellular telephone for another thirty days (Sprint 114). This extension was based on the State's application and submission of Detective Casilli's prior affidavits together with a new thirty-page affidavit of Detective Casilli that detailed the evidence obtained by the State pursuant to the two most recently authorized wiretaps that were in place on defendant Picerno's cellular telephone and his home telephone.
The State Police maintained the wiretaps on both defendant Picerno's cellular telephone (Sprint 114) and his home telephone (Verizon 115) until sometime during the day following his arrest on February 16, 2002.[4] Overall, the State Police intercepted a total of 1,576 calls from the Sprint 113, Sprint 114, and Verizon 115 wiretaps.
Discovery filed by the State in these criminal cases indicates that the State Police filed detailed weekly reports regarding the progress of Sprint 114 with the Presiding Justice, continued to keep monitoring logs regarding these interceptions and documented the chain of custody regarding the tape recordings comprising the Sprint 114 and Verizon 115 wiretaps. The State concedes that the box containing these tape recordings that had been sealed previously at the direction of the Presiding Justice did not remain under seal and was not stored in accordance with those directions; it maintains, however, that each of the individual tapes that comprise the Sprint 114 and Verizon 115 wiretaps were sealed in accordance with the Presiding Justice's directions and remain under seal.
Defendants Picerno and Oster move to suppress the contents of all of these intercepted conversations (Sprint 113, Sprint 114 and Verizon 115) from their respective trials. Because the defendants filed their motions to suppress the electronic surveillance evidence with this Court as part of their pre-trial motions, the Court transferred the motions to the Presiding Justice pursuant to R.I. Gen. Laws § 12-5.1-12(c).[5] The Presiding Justice then transferred the motions to this Court and designated this Court to hear and decide the motions. See R.I. Gen. Laws § 12-5.1-12(c). This Court heard arguments on all issues raised by the defendants on January 14, 2004, except defendants' so-called "minimization" arguments. On January 15, 2004, to expedite and streamline defendants' minimization challenges, all parties agreed to a sequence of briefing due to the issue's unique burdens of production and voluminous documentation.[6]
In the instant motions, defendants Picerno and Oster seek to exclude the wiretap evidence on a number of grounds. Defendants first challenge the wiretap authorizations, arguing that the applications and affidavits fail on their face to satisfy the statutory requirements of probable cause and necessity. Second, the defendants argue that, in executing the wiretap orders, the State failed to properly minimize the interception of non-pertinent communications. Finally, the defendants seek to suppress the wiretap evidence on grounds that the State failed to comply with the sealing, storage, and disclosure requirements of the Rhode Island Wiretap Statute, R.I. Gen. Laws, § 12-5.1-1 etseq.
 II. GENERAL PRINCIPLES OF RHODE ISLAND WIRETAP LAW
The Rhode Island Supreme Court has held that Rhode Island citizens have "a double barreled source of protection which safeguards their privacy from unauthorized and unwarranted intrusions: the fourth amendment of the Federal Constitution and the Declaration of Rights which is specified in the Rhode Island Constitution." State v. Sitko, 460 A.2d 1, 2 (R.I. 1983) (quoting State v. Luther, 116 R.I. 28, 29, 351 A.2d 594, 594-95
(1976)). In addition, statutory requirements mandate procedures for intercepting wire communications that extend beyond the constitutional minimum. United States v. Nelson-Rodriguez,319 F.3d 12, 32 (1st Cir. 2003). These standards for intercepting wire communications and admitting such evidence at trial are set forth in the Rhode Island Wiretap Statute, R.I. Gen Laws §12-5.1-1 et seq., and the Federal Wiretap Statute, 18 U.S.C. § 2510-2521. The Federal Wiretap Statute extends to both state and federal courts. Pulawski v. Blais, 506 A.2d 76, 77 (R.I. 1986); State v. Delaurier, 488 A.2d 688, 692 (R.I. 1985). The Rhode Island legislature modeled the Rhode Island Wiretap Statute after its federal counterpart; indeed, the state statute closely parallels the federal statute. Pulawski, 506 A.2d at 77 n. 1 (R.I. 1986); State v. Ahmadjian, 438 A.2d 1070, 1080 n. 4 (R.I. 1981). Although the Rhode Island Supreme Court has "departed from the federal courts in insisting there be strict, rather than substantial, compliance with certain sections of the state statute, the legislative goals of the two acts are clearly comparable." State v. Campbell, 528 A.2d 321, 324, 328 n. 10 (R.I. 1987) (noting that despite strict compliance standard, hypertechnicality standard is disfavored) (internal citations omitted).[7] This Court is mindful of these precepts as it considers the issues raised by the parties in this case.
 III. STANDING
A preliminary matter exists as to whether defendant Oster has standing to challenge certain interceptions. The State argues that defendant Oster does not have standing to contest the admissibility of calls to which he was not a party. For two independent reasons, this Court does not reach this issue.
First, the State concedes that defendant Picerno has standing to object to all intercepted calls. Defendants Picerno and Oster raise the same issues in each of their motions to suppress electronic surveillance.[8] Thus, even assuming, without deciding, that defendant Oster does not have standing, this Court would nevertheless be deciding the same issues. See Scott v.United States, 436 U.S. 128, 136, 98 S.Ct. 1717, 1723,56 L.Ed.2d 168, 177 (1978). Conversely, if Oster has standing, this Court would repeat the exact same analysis. See id.; UnitedStates v. Feldman, 606 F.2d 673, 676 n. 7 (6th Cir. 1979). "In this circumstance we need not decide the question of [defendant Oster's] standing." Scott v. United States, 436 U.S. 128, 136,98 S.Ct. 1717, 1723, 56 L.Ed.2d 168, 177 (1978); see UnitedStates v. Lucht, 18 F.3d 541, 547 n. 1 (8th Cir. 1994) (need not decide standing issue because at least one defendant has standing and thus analysis would be the same as to all defendants);accord United States v. Feldman, 606 F.2d at 676 n. 7 (need not decide standing issue because, irrespective of the other appellants' standing, the court is required to decide the same issues on the merits).
Second, given this Court's decision on the issues raised by defendants Picerno and Oster, the question of defendant Oster's standing — for the purposes of this decision — becomes irrelevant. The arguments raised by defendant Oster and decided herein would fail even if this Court were to find that he has standing.[9] See infra (denying arguments for suppression); see also, e.g., United States v. Willis,890 F.2d 1099, 1101 n. 3 (10th Cir. 1989) (potential standing question need not be addressed because no minimization problem exists); United States v. Badalamenti, 794 F.2d 821, 824 (2d Cir. 1986) (need not decide standing for wiretap sealing argument because evidence is admissible); United States v. Hillard,701 F.2d 1052, 1062 (2d Cir. 1983) (because adequate probable cause existed to support the wiretap order, the court need not decide standing for such a challenge); United States v. Abascal,564 F.2d 821, 827 (9th Cir. 1977) (where no minimization problem exists, court need not decide standing or determine appropriate relief hypothetically).
 IV. FACIAL SUFFICIENCY OF APPLICATIONS AND AFFIDAVITS
Defendants first attack the legality of the initial wiretap authorization, arguing that the wiretap application and supporting affidavit failed to satisfy the statutory requirements of probable cause and necessity. See R.I. Gen. Laws §§12-5.1-4(a)(1)-(4). They claim that these deficiencies in the initial wiretap authorization infect the subsequent authorizations such that all of the electronic surveillance garnered pursuant to these authorizations ought to be suppressed at trial.
This challenge implicates the following provisions of the Rhode Island Wiretap Statute that condition authorization of the interception of wire, electronic or oral communications on a determination by the Presiding Justice, based on the facts contained in the application submitted by the State, that:
 (1) There is probable cause for belief that an individual is committing, has committed, or is about to commit a particular designated offense;
 (2) There is probable cause for belief that particular communications concerning that offense will be obtained through the interception;
 (3) Normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried, or to be too dangerous;
 (4) There is probable cause for belief that the facilities from which, or the place where, the wire, electronic, or oral communications are to be intercepted, are being used, or are about to be used, in connection with the commission of the offense, or are leased to, listed in the name of, or commonly used by the individual.
R.I. Gen. Laws § 12-5.1-4(a)(1) — (4). See State v. Campbell,528 A.2d 321, 326 (R.I. 1987). The probable cause requirements for issuance of authorization for a wiretap are contained in subparagraphs (1), (2) and (4) of R.I. Gen. Laws § 12-5.1-4(a), whereas the necessity requirement is contained in subparagraph (3) of that statutory provision.
This Court first will address the legal standards applicable to its review of the Presiding Justice's findings of probable cause and necessity. It then will apply those standards to the applications and affidavits submitted to the Presiding Justice to determine whether the record supports his findings.
 A. Standard of Review
The Rhode Island Supreme Court has held that the probable cause principles governing a judge's issuance of a traditional search warrant apply as well to electronic surveillance. Campbell,528 A.2d at 326 (citing State v. McGoff, 517 A.2d 232, 235-36 (R.I. 1986)); State v. Pratt, 641 A.2d 732, 736-37 (R.I. 1994) (discussing probable cause). Applying a totality-of-the-circumstances test, therefore, the Presiding Justice was required to "make a practical common-sense decision, given all the circumstances set forth in the affidavit before him, including the `veracity' and `basis of knowledge' [of the affiant, that] there was a fair probability . . ." that Picerno and others were committing, had committed, or were about to commit extortion, bribery, or conspiracy to commit extortion or bribery, and that communications concerning these offenses would be obtained through the interception. Campbell, 528 A.2d at 326
(citing Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317,2332, 76 L.Ed.2d 527, 548 (1983)). There is no specific formula; instead, the issuing judge must decide "whether there is probable cause to believe that evidence of a crime will be uncovered." United States v. Giacalone, 853 F.2d 470, 478 (6th Cir. 1988) (citing Illinois v. Gates). Although the standard requires more than mere suspicion that criminal activity is afoot, the "quantum of proof . . . is significantly different from the degree needed to establish guilt." Pratt,641 A.2d at 736 (R.I. 1994) (citing cases). Probable cause requires only a fair probability, not a prima facie showing, of criminal activity. Id.; Campbell, 528 A.2d at 326; Giacalone,853 F.2d at 478.
The scope of review over an issuing justice's finding that the government's application and affidavit satisfied the statutory requirement of probable cause is to determine "if the facts set forth in the application were minimally adequate to support the determination that was made." United States v. Ashley,876 F.2d 1069, 1074-75 (1st Cir. 1989). Absent an allegation of misrepresentation or falsity in the wiretap application, the reviewing court "is not permitted to conduct an independent, denovo assessment of the sufficiency of the factual allegations." 2 Carr, The Law of Electronic Surveillance § 6:32 at 6-80 (2003); see Ashley, 876 F.2d at 1074-75 (1st Cir. 1989). Rather, when considering a suppression motion challenging the issuing court's determination, the trial justice, like an appellate court, must take the facts as stated in the application and affidavit at face value, deciding whether those facts are minimally adequate to support the findings of probable cause.Ashley, 876 F.2d at 1074-75 (1st Cir. 1989); 2 Carr, The Lawof Electronic Surveillance § 6:32 at 6-80 (2003).
In addition, the issuing justice's finding of probable cause is afforded great deference by the reviewing court. State v.Pratt, 641 A.2d 732, 736-37 (R.I. 1994) (quoting cases). The reviewing court's duty is simply to ensure that the justice issuing the electronic surveillance authorization had a "`substantial basis' for concluding that probable cause existed."Id.; State v. Campbell, 528 A.2d 321, 326 (R.I. 1987); seealso Ashley, 876 F.2d at 1074-75. As aptly put by the Court in Giacalone in discussing the standard of review for wiretap authorizations:
 [s]ince the issuing judge is in the best position to determine all of the circumstances in the light in which they may appear at the time, "great deference" is normally paid to the determination of an issuing judge. "Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according `great deference' to a magistrate's determination." United States v. Leon, 468 U.S. 897, 914, 104 S.Ct. 3405, 82 L.Ed.2d 677
(1984) (quoting Spinelli v. United States, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637
(1969)). Thus, the fact that a later trial judge or reviewing court may feel that a different conclusion was appropriate does not require, nor even authorize, the suppression of evidence gained through such a warrant. In United States v. Lambert, 771 F.2d 83, 93 (6th Cir.), cert. denied, 474 U.S. 1034, 106 So. Ct. 598, 88 L.Ed.2d 577 (1985), we held that a magistrate's determination on the question of probable cause will not be reversed if the record contains a "substantial basis for his [or her] probable cause findings."
United States v. Giacalone, 853 F.2d 470, 479 (6th Cir. 1988) (quoting United States v. Alfano, 838 F.2d 158, 162 (6th Cir. 1988)).
The above-discussed standard of review is also applicable to this Court's review of the Presiding Justice's determination that the State satisfied the necessity requirement. See UnitedStates v. Ashley, 876 F.2d 1069, 1074-75 (1st Cir. 1989) (discussing standard of review for challenges to facial adequacy of affidavit). This Court must examine the application and determine "if the facts set forth in the application were minimally adequate to support the determination that was made."Id. This Court is required to uphold the wiretap authorization if the Presiding Justice "could have reasonably concluded that normal investigatory procedures appeared to be unlikely to succeed." United States v. Lopez, 300 F.3d 46, 52-53 (1st Cir. 2002); Ashley, 876 F.2d at 1075.
 B. Probable Cause
The defendants argue that the initial wiretap application and supporting affidavit are facially insufficient because of a deficient showing of probable cause. More specifically, defendant Picerno challenges the wiretap application as failing to establish probable cause to believe: (1) that he is involved in ongoing criminal activity beyond that already discovered by the State; and (2) that the telephones in question are being used in furtherance of criminal activity. Defendant Oster argues that there was no probable cause to believe that suspected co-conspirators would engage in telephonic communications with defendant Picerno regarding the designated crimes. The defendants challenge neither the veracity of the information contained in the affidavit supporting the initial wiretap application nor the reliability of the information supplied to the affiant. SeeUnited States v. Ashley, 876 F.2d 1069, 1073-74 (1st Cir. 1989) (citing Franks v. Delaware, 438 U.S. 154 (1978) and contrasting challenge of factual omissions with challenge of facial inadequacy). Rather, the defendants challenge the facts set forth in the application and affidavit as not minimally adequate to support a probable cause determination.
 1. Probable Cause of Designated Criminal Activity
Detective Casilli's initial affidavit, dated November 16, 2001, details a host of public corruption schemes involving defendant Picerno.[10] It lists facts tending to show defendant Picerno's involvement with family members and others in fraudulent activity concerning a mortgage loan on defendant Picerno's residence at 1 Preakness Drive, Lincoln, Rhode Island that deprived the Town of back taxes. It also documents a confidential source who says that he or she was pressured by defendant Picerno to sell a lot to Picerno in exchange for municipal approvals for the property.
The affidavit goes on to recount complaints by Robert Gelfuso and David Wayne Daniel about defendant Picerno's extortion of their development and construction company, Major Construction. It provides specific details regarding the nature of the extortion and how the detectives investigated and independently corroborated the complaints. It describes that Major Construction entered into a contract with the Town of Lincoln to build the Fairlawn Park Project. Defendant Picerno wanted the company to submit bogus cost overruns from which he would be paid monies. Under the pretext of strict oversight, a municipal employee, Stephen Balestra, repeatedly harassed Daniel regarding job site deficiencies. These deficiencies were discussed in meetings with defendant Oster. Defendant Picerno then visited the worksite, asked if there were any problems, and in response to the Balestra problem, suggested that they pay $5,000 (only in cash) for Jonathan Oster's birthday/fundraiser. Only after Daniel paid defendant Picerno cash ($4,750) did Balestra stop visiting the worksite. In a later meeting, defendant Picerno explained the incident, referred to Oster and Balestra, and stated "you gotta work with these guys" or you get "thrown" off the job.
According to the affidavit, when Daniel told Gelfuso about being extorted, Gelfuso demanded that defendant Picerno return the company's money. Defendant Picerno then threatened Gelfuso and his family with overtures of physical violence and advised Gelfuso to check Picerno's background and his claim that he knew drug dealers and other criminals in Providence. In an apparent attempt to conceal his extortion, defendant Picerno ultimately returned the money to Daniel and said "It's not all mine you know."
Detective Casilli's affidavit then describes the bribery scheme connected with Major Construction's intended purchase of the H 
H Screw property from the Town of Lincoln. The befouled plan, to be facilitated by defendant Picerno, would enable Major Construction to purchase the H H Screw property for a fraction of its assessed value if it paid $15,000 in so-called "legal fees" and $25,000 in cash outside of the purchase and sale agreement.
Additionally, the affidavit featured excerpts of defendant Picerno's statements — during a meeting with Gelfuso regarding the H H Screw transaction in which Gelfuso wore a State Police recording device — indicating that Picerno was conspiring with other individuals of apparent disrepute. When Gelfuso asked if defendant Oster was getting the cash paid outside the purchase and sale agreement, for example, defendant Picerno stated, "I'm not going to tell you that." Gelfuso then indicated that he knew Oster was receiving the money. In response, defendant Picerno ironically exclaimed, "I can't admit anything . . . [because] too many guys out there are [expletive] wired." Picerno also stated that he was not getting the $15,000 in legal fees and that it was going to "Bobby Campellone," who apparently owns a realty and car dealership. When further pressed by Gelfuso as to who was getting the $25,000 in cash, defendant Picerno responded that "[y]ou have to understand it's going somewhere. . . ." Gelfuso later stated, "I know it's going to Oster, you know it's going to Oster." Picerno replied, "[a]lright, so we all know what has happened. . . ."
In addition to Oster, Balestra, and Campellone, the affidavit also cites evidence of additional possible conspirators, including Attorney Donald Lembo (who was to hold part ownership of H H Screw on behalf of defendant Picerno) and James Howe (a jeweler who defendant Picerno referred to as a good friend who posted bail for one of the individuals accused of assaulting Councilman Dean Lees).
Given these facts and the totality of the circumstances as set forth in the initial wiretap application and affidavit, this Court finds that the Presiding Justice had a substantial basis for concluding that there was a fair probability that the designated crimes of bribery, extortion and conspiracy to commit those offenses were afoot. In addition, though not necessary, this Court notes that, even examining the affidavit de novo, it more than adequately establishes probable cause. Defendant Picerno incorrectly argues that the application does not establish probable cause to believe that he was involved in any ongoing criminal enterprise beyond that already discovered. Not only is this argument incorrect factually, but it is also an incorrect statement of the law.
Legally, the State need not establish probable cause of ongoing criminal activity beyond that already discovered. The Rhode Island Wiretap Statute requires the issuing judge to find "probable cause for belief that an individual is committing,has committed, or is about to commit a particular designated offense." R.I. Gen. Laws § 12-5.1-4(a) (emphasis added). The statute thus clearly and unambiguously requires probable cause of either past, present, or future designated criminal activity. The affidavit's showing of probable cause of defendant Picerno's past or currently ongoing criminal activity is sufficient; a showing of probable future criminal activity of that nature is not required.
Factually, defendant Picerno's argument is also incorrect. The totality of the circumstances set forth in the affidavit indicates to a fair probability that the State uncovered only the proverbial tip of the iceberg and that there existed a wealth of undiscovered criminal activity on the part of defendant Picerno connected with his role as a public official. The affidavit suggests that defendant Picerno's corrupt dealings with Major Construction regarding Fairlawn Park and H H Screw were far from over. The affidavit also is replete with instances where defendant Picerno tacitly refers to other criminal involvement, beyond that directly concerning H H Screw and Fairlawn Park. These references combine under a totality-of-the-circumstances test to show Picerno's probable involvement in expansive criminal operations of bribery, extortion and conspiracy.
Defendant Picerno, for example, referred to Lincoln Town Councilman Dean Lees's interference with Picerno's nefarious operations and how he got "a good beating" from two individuals that Picerno referred to as "the French Connection." Defendant Picerno then coyly denied involvement with laughter. The State Police verified that such an assault took place. Also, while discussing the specifics of the shady H H Screw deal, defendant Picerno indicated that he has similar connections in Providence, North Providence, and Lincoln, Rhode Island. Defendant Picerno declared, "[y]ou just let me know . . . if you need anything." When asked how strong his connections were in North Providence, defendant Picerno stated that they were "good."
For all of these reasons, there was no error in the Presiding Justice's probable cause findings. He correctly determined, based on the application and affidavit submitted to him on November 16, 2001, that "[t]here is probable cause for belief that an individual is committing, has committed, or is about to commit the designated offenses of bribery, extortion or conspiracy to commit those crimes." R.I. Gen. Laws § 12-5.1-4(a)(1).
 2. Probable Cause of Telephone Use
Aside from probable cause as to the designated criminal activity, defendants also argue that there was no probable cause to believe that incriminating conversations could be intercepted through the wiretap sought by the State. See R.I. Gen. Laws §12-5.1-4(a)(2) and (4). This Court disagrees. Based on the totality of the circumstances set forth in Detective Casilli's November 16, 2001 affidavit, the Court finds a substantial basis to support the Presiding Justice's finding of probable cause to believe that incriminating conversations regarding the designated offenses of bribery, extortion or conspiracy to commit those crimes would be intercepted over defendant Picerno's telephone.
Given the nature of the alleged criminal activities, there was a substantial basis for the Presiding Justice to conclude that defendant Picerno would discuss the specific illegal activities with others over his telephone. As discussed above, the affidavit did not merely establish that Picerno was involved in one isolated criminal event as a sole proprietor. Rather, the affidavit established probable cause for believing that Picerno was conspiring with a number of other conspirators, known and unknown, in connection with the commission of a broad array of continuing extortion and bribery schemes. Thus, the number of defendant Picerno's co-conspirators combined with his number of festering activities makes it at least probable that he would communicate concerning these offenses over his telephone.
Detective Casilli's affidavit, however, goes even further and states specific instances in which defendant Picerno was using his telephone to discuss criminal activity. The affidavit states that defendant Picerno received calls from Gelfuso and Daniel on his cellular telephone regarding the Fairlawn Park extortion and the H H Screw deal. It states that defendant Picerno discussed money with his son, a principal in the alleged mortgage fraud scheme, over his cellular telephone. Gelfuso and Daniel witnessed Picerno making and receiving calls from his cellular telephone and were directed to call Picerno on that phone. Additionally, the caller identification feature on Daniel's cellular telephone indicated that defendant Picerno placed calls to Daniel. Defendant Picerno's cellular telephone is in the name of Brenda Michelletti (a known associate of Picerno's who the State Police suspect assisted Picerno's son in obtaining a mortgage by fraudulent means).
For these reasons, the Presiding Justice had more than a substantial basis for his probable cause findings mandated by the Rhode Island Wiretap Statute, R.I. Gen. Laws § 12-5.1-4(a)(1), (2), and (4). A substantial basis existed for the Presiding Justice to conclude, given all of the circumstances set forth in the November 16, 2001 affidavit, that there was a fair probability that defendant Picerno and others were committing, had committed, or were about to commit extortion, bribery, or conspiracy to commit these crimes, and that communications concerning these offenses would be obtained through the interception.
 3. Subsequent Wiretap Authorizations
The defendants challenge not only the initial wiretap authorization as lacking in probable cause but also all of the subsequent wiretap authorizations. In doing so, however, the defendants acknowledge that this Court's determination that the initial authorization was founded on probable cause may well be dispositive of the issue of whether the subsequent authorizations are based on probable cause.[11]
This Court need not belabor the sufficiency of probable cause in the State's subsequent wiretap applications and affidavits dated December 14, 2001; January 18, 2002; January 28, 2002 and February 15, 2002. By citing additional facts and incriminating conversations intercepted pursuant to earlier wiretap authorizations, the initial affidavit's already sufficient showing of probable cause snowballed, creating even more of a substantial basis for the Presiding Justice's later probable cause findings. The application for wiretap authorization dated December 14, 2001, for example, is supported not only by Detective Casilli's original affidavit, but also by his affidavit of that same date that catalogs the intervening incriminating calls that the State Police intercepted pursuant to the initial authorization (including conversations between defendant Picerno and Gelfuso regarding the H H Screw deal and evidence of another bribery and extortion scheme involving developer Dennis Gray). Probable cause for that authorization, therefore, is supported not only by the original affidavit but by the mounting incriminating facts detailed in the subsequent affidavit. Likewise, both of the January 2002 applications and affidavits, and those filed in February 2002, cite additional intervening incriminating facts and conversations that make the case for probable cause stronger in each successive application. Consequently, upon applying the totality-of-the-circumstances test, this Court finds that the facts set forth in each wiretap application and affidavit are more than minimally adequate to support the Presiding Justice's probable cause findings.
 C. Necessity
The so-called "necessity" requirement is the latter basis of the defendants' two-prong challenge to the validity of the wiretap authorization. In addition to the probable cause requirements enumerated in the Rhode Island Wiretap Statute, R.I. Gen. Laws §§ 12-5.1-4(a)(1), (2) and (4), the statute requires the Presiding Justice to find, on the basis of the facts submitted, that "[n]ormal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried, or to be too dangerous." R.I. Gen. Laws §12-5.1-4(a)(3). The statute also requires the wiretap application to contain "[a] full and complete statement" to this effect. Id. § 12-5.1-2(b)(3). Defendants argue that the wiretap applications and affidavits failed to meet these requirements. Defendants cite the success of earlier stages of the investigation and suggest that other plausible traditional investigatory techniques, such as continuing the use of informants and turning defendant Picerno into a government witness, should have been employed in lieu of, or as a prerequisite to, electronic surveillance.
The Rhode Island Supreme Court has not had the opportunity to discuss principles of the necessity requirement at length. It is possible, however, to glean from our Supreme Court's decision inState v. Ahmadjian, 438 A.2d 1070, 1083-84 (1981), that the necessity requirement in the Rhode Island Wiretap Statute is consistent with generally accepted standards under the federal statute. Compare Ahmadjian, 438 A.2d at 1083-84 withUnited States v. Ashley, 876 F.2d 1069, 1072 (1st Cir. 1989);see also United States v. Costello, 610 F. Supp. 1450,1467-68 (N.D. Ill. 1985) (citing the decisions of various federal circuit courts on the necessity requirement). In Ahmadjian, the Rhode Island Supreme Court rejected the defendants' necessity argument, holding that "defendants' assertions that other techniques could have been utilized by the State Police to uncover the identities of others involved are pure speculation." The Court held that:
 [s]trict compliance with the [wiretap] statute does not mean, as contended by defendants, that a wiretap may not issue except upon a showing of absolute necessity. All that must be strictly complied with is the requirement that the state provide a full statement setting forth why investigative procedures have failed or are reasonably likely to fail or that they are too dangerous.
State v. Ahmadjian, 438 A.2d 1070, 1083 (R.I. 1981).
Accordingly, the State is not required to "exhaust every conceivable alternative" or "show that other methods have been wholly unsuccessful." Ashley, 876 F.2d at 1072. Rather, the affidavit in support of the wiretap application is required to "show why wiretapping is necessary in place of less intrusive investigative techniques. [I]t does not impose an exhaustion requirement." United States v. Nelson-Rodriguez, 319 F.3d 12,33 (1st Cir. 2003) (internal citation omitted). As such, a wiretap authorization is not invalid "simply because defense lawyers are able to suggest post factum some investigative technique that might have been used and was not." Costello,610 F. Supp. at 1467 (quoting United States v. Hyde, 574 F.2d 856,867 (5th Cir. 1978)). In short, the issuing court must be satisfied that wiretapping is reasonable, given the statutory preference for traditional techniques, due to difficulties in penetrating the criminal organization or in gathering evidence.United States v. Abou-Saada, 785 F.2d 1, 11 (1st Cir. 1986). The necessity requirement seeks to ensure that wiretapping is not routinely employed as the initial step in a criminal investigation. Id.
In light of these teachings, this Court has scrutinized carefully the State's affidavits that were incorporated by reference into its applications and finds that they relate more than enough information for the Presiding Justice to "have reasonably concluded that normal investigatory procedures appeared to be unlikely to succeed." Ashley, 876 F.2d at 1075. Indeed, even with a de novo review, the State's antecedent efforts were sufficient to satisfy the necessity requirements of §§ 12-5.1-4(a)(3) and 12-5.1-2(b)(3) of the Rhode Island Wiretap Statute. In excruciating detail, the affidavits of Detective Casilli recount the State's investigations that did not wholly succeed. The affidavits go on to explain the reasons for the failure and expected failure of traditional investigatory techniques.
The State's earlier extensive use of confidential informants proved to be of limited assistance. These witnesses and informants were primarily victims and had little knowledge of other conspirators beyond defendant Picerno or the scope of the conspiracy. Though the State was successful in gathering incriminating evidence against defendant Picerno (albeit not concerning all of his criminal activities), it is widely recognized that "wiretap[s] not only serve to `incriminate the known person whose phone is tapped, [but] to learn the identity of the far-flung conspirators and to delineate the contours of the conspiracy.'" United States v. Uribe, 890 F.2d 554, 557
(1st Cir. 1989) (quoting United States v. Quintana,508 F.2d 867, 874 (7th Cir. 1975)).
In addition, the informants' attempts to goad such information from defendant Picerno were not entirely successful. Defendant Picerno spoke cryptically and even acknowledged his fear of persons being "wired." A "significant factor to be considered by the [issuing] court in its determination of whether to authorize electronic surveillance" is the "craftiness and wariness of the intended targets. . . ." Ashley, 876 F.2d at 1073 (citingUnited States v. Scibelli, 549 F.2d 222, 227 (1st Cir. 1977)).
The affidavits also state two reasons for the unlikely success of physically tracking suspects and maintaining visual surveillance. First, the nature of the crime — such as criminal activity occurring during meetings in Lincoln Town Hall — and, second, the secluded nature of some residences, would make it virtually impossible for watchers to remain inconspicuous. SeeAshley, 876 F.2d at 1072 (nature of the alleged crime relevant in determining necessity); United States v. Hoffman,832 F.2d 1299, 1307 (1st Cir. 1987) (noting that secluded homes make visual surveillance nearly impossible).
Detective Casilli also explained his doubts regarding any potential success of Grand Jury proceedings. Not only was the State unwilling to grant defendant Picerno immunity in return for his testimony, but defendant Picerno's apparent allegiance to his co-conspirators made truthful testimony unlikely. Moreover, the affidavits outline yet another significant factor diminishing the likelihood of success of calling witnesses before the Grand Jury: the reluctance of witnesses to cooperate due to fear of physical retribution. See Hoffmann, 832 F.2d at 1307 (considering fear of physical harm to informants). Evidence that the conspiracy used violence against Dean Lees and the strong reservations that John Barr, David Wayne Daniel and an unknown source expressed to Detective Casilli about testifying against defendant Picerno permits such a reasonable conclusion. Detective Casilli doubted that a Grand Jury proceeding could develop sufficient evidence to indict and convict all conspirators involved in the conspiracy or define the contours of the conspiracy without calling defendant Picerno to testify. Indeed, he feared that issuing witness subpoenas and taking testimony of witnesses before the Grand Jury could alert defendant Picerno and other co-conspirators of the investigation and thus compromise it.
Furthermore, undercover infiltration was seemingly impossible because the conspiracy did not welcome outsiders to its apex; the investigation indicated that defendant Picerno was the broker between other conspirators and outsiders. Had an undercover agent attempted to join the conspiracy, defendant Picerno "would have identified him as quickly as Ali Baba in his cave would have spotted a spy among his chosen forty." See United States v.London, 66 F.3d 1227, 1236 (1st Cir. 1995) (discounting effectiveness of undercover agents in some situations).
This concern about disclosure that could compromise the investigation applied as well to witness interviews. Detective Casilli expressed the fear that further interviews would alert defendant Picerno and other conspirators of a State Police investigation that could compromise the investigation. Another important factor, which made the investigation particularly prone to "leaks" resulting from witness interviews, was the unknown extent of the conspiracy's membership. Exacerbating this concern was the State's belief that the conspiracy rose to the highest levels of the Lincoln town government. Evidence of secondary disclosures that already had occurred included the known conversations between John Barr and Jonathan Oster.
Additionally, the State's execution of search warrants would have been largely ineffective because the nature of the conspiracy involved primarily intangible evidence, such as verbal statements and agreements. Financial and real estate transactions were concealed through the use of cash, so-called front men and front organizations, and "doctored" legal documents via alleged co-conspirators belonging to the Rhode Island bar.[12]
Execution of a search warrant also could expose the active investigation and increase the risk of a loss of evidence.
For these reasons, the affiant, the State Police Financial Crimes Unit, and the Presiding Justice reasonably could have concluded at the time of the first application for a wiretap and thereafter that prior use of traditional investigative methods had not been wholly successful and reasonably appeared unlikely to succeed. This conclusion became even more sound as the wiretaps progressed and yielded the very fruit that Detective Casilli suggested originally necessitated the wiretap. Along with the totality of the circumstances set forth in the affidavits, the Court has considered these reasons in conjunction with the affiant's conclusions that the wiretaps were not only necessary but were the only way to identify and prosecute all conspirators involved in the extortion and bribery activity — a conclusion founded on Detective Casilli's participation in over 100 hundred fraud investigations and several public corruption cases. SeeUnited States v. Ashley, 876 F.2d 1069, 1072 (1st Cir. 1989) (citing United States v. Landmesser, 533 f.2d 17, 20 (6th Cir. 1977)). The defendants neither cast doubt on the scope or sincerity of the State's earlier investigatory efforts nor convincingly suggest fruitful alternatives that may have enabled the State to pursue its legitimate objectives of identifying the true depth of the conspiracy, its activities and the identity of "far-flung conspirators." Uribe, 890 F.2d at 557.
 V. EXECUTION OF THE WIRETAP ORDER: MINIMIZATION EFFORTS A. The Law of Minimization
Defendants Picerno and Oster argue that in executing the wiretap order, the State failed to properly minimize the interception of non-pertinent communications. The minimization requirement, set forth explicitly in the Rhode Island Wiretap Statute, provides, in pertinent part, as follows:
 [e]very order and extension shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must terminate upon attainment of the authorized objective, or in any event in thirty (30) days.
R.I. Gen. Laws § 12-5.1-5(b) (emphasis added.) This Court has examined all of the wiretap orders and extensions authorized by the Presiding Justice in this matter and determined that each of the orders and extensions contain a minimization provision pursuant to § 12-5.1-5(b). Hence, the operative question is whether the State's execution of the authorized wiretap complied with the minimization orders. Cf. State v. Luther,116 R.I. 28, 30, 351 A.2d 594, 595 (1976) (suppression required where order failed to contain provisions mandated by § 12-5.1-5(b)). The Presiding Justice's minimization orders specifically required that:
 interception of persons using telephone number [citing telephone numbers subject to Sprint 113, Sprint 114, or Verizon 115 wiretaps] other than Robert R. Picerno and the interceptions not related to the above-specified offenses, be minimized and every sixty (60) seconds be spot-monitored for a brief period of time, and such interceptions will be so conducted as to minimize or eliminate interceptions of privileged communications between lawyer and clients, clergymen and confidants, husbands and wives or other privileged communications.
The issue of interpreting and applying the minimization requirement of the Rhode Island Wiretap Statute, as embodied in the wiretap orders in this case, is one of first impression in Rhode Island. The Rhode Island Supreme Court only has mentioned the minimization requirement in passing while considering other wiretap issues. See State v. Sitko, 460 A.2d 1, 4 (R.I. 1983); State v. Maloof, 114 R.I. 380, 383 (R.I. 1975). The federal minimization mandate codified in the Federal Wiretap Statute, 18 U.S.C. § 2518(5), is virtually identically to its Rhode Island counterpart.[13] Compare 18 U.S.C. § 2518(5)with R.I. Gen. Laws § 12-5.1-5(b). For guidance, this Court thus may look to interpretations of the federal law that are not inconsistent with existing principles of Rhode Island wiretap law. See Section II supra (briefly outlining general wiretap principles); see also discussion in Section IV(C) supra
(citing State v. Ahmadjian and opining that Rhode Island necessity requirement is consistent with federal view).
This Court is mindful that our Supreme Court has stated that "[i]n the interest of giving the full measure of protection to an individual's privacy, particularly as it relates to electronic eavesdropping, we shall insist upon a closer adherence to the Rhode Island statute than may be expected by those who interpret the federal legislation." State v. Maloof, 114 R.I. 380, 390,333 A.2d 676, 681 (1975). The Rhode Island Supreme Court has looked to federal precedents, however, when deciding questions of Rhode Island wiretap law, notwithstanding its earlier departure from the "federal courts in insisting that there be strict, rather than substantial, compliance with certain sections of the state statute." State v. Campbell, 528 A.2d 321, 328-29 n. 10 (R.I. 1987) (relying on decisions of federal courts for wiretap issues). The Supreme Court in Campbell reasoned that the "legislative goals of the two acts are clearly comparable."Campbell, 528 A.2d at 328 n. 10.
Similarly, the Rhode Island Supreme Court generally has sanctioned looking to federal precedents for guidance in other areas when the language of the state and federal statutes or rules is similar. E.g., Furtado v. Laferriere, 839 A.2d 533,540 (R.I. 2004), ("look to federal court interpretation of analogous federal rule for guidance in applying our own state's rule"); State v. Rodriguez, 822 A.2d 894, 908 (R.I. 2003) (similar wording of state and federal double jeopardy clauses is reason to look to federal precedents for guidance); Newport ShipYard v. Rhode Island Comm'n for Human Rights, 484 A.2d 893,897-898 (R.I. 1984) (holding trial justice should have looked to federal court decisions for guidance in construing Rhode Island provisions analogous to federal Civil Rights Act); NarragansettElec. Co. v. Rhode Island Comm'n for Human Rights, 118 R.I. 457,460, 374 A.2d 1022, 1023 (1977) (appropriate to refer to federal decisions dealing with Title VII of Civil Rights Act because its provisions are "virtually the same" as Rhode Island provisions). Accordingly, this Court will look to federal minimization precedents but will be mindful of potentially more strict Rhode Island standards.
 1. Burden of Production
Once the defendant challenges the State's minimization as improper, the burden is on the State to establish that its minimization efforts were reasonable. United States v.Torres, 908 F.2d 1417 (9th Cir. 1990); United States v.Willis, 890 F.2d 1099 (10th Cir. 1989); United States v.Armocida, 515 F.2d 29, 45 (3rd Cir. 1975); United States v.Rizzo, 491 F.2d 215, 217 n. 7 (2nd Cir. 1974); United States v.Lopez, No. 99-79-P-C, 2000 U.S. Dist. LEXIS 8060, at *22-23 (D. Me. April 28, 2000). After the State makes such a prima facie
showing of reasonable minimization efforts, the burden then shifts to the defendant. Torres, 908 F.2d at 1423; Willis,890 F.2d at 1102; Armocida, 515 F.2d at 45; United States v.Quintana, 508 F.2d 867, 875 (7th Cir. 1974); Rizzo,491 F.2d at 217; United States v. Lopez, No. 99-79-P-C, 2000 U.S. Dist. LEXIS 8060, at *22-23. But see United States v. Giacalone,853 F.2d 470, 482 (6th Cir. 1988); United States v. Gruber,994 F. Supp. 1026, 1048 (D. Iowa 1998) (requiring defendant to make an initial showing of improperly minimized calls before putting government to its burden of establishing a prima facie case). The defendant must demonstrate why the minimization was improper,United States v. Cleveland, 964 F. Supp. 1073, 1092 (E.D. La. 1997), show that despite reasonable compliance, "substantial unreasonable interception of no pertinent conversations occurred," United States v. Ianniello, 621 F. Supp. 1455, 1470
(S.D.N.Y. 1985), or show that more effective minimization could have taken place. United States v. Lopez, No. 99-79-P-C, 2000 U.S. Dist. LEXIS 8060, at *22-23. Some courts require the defendant to show, despite the State's reasonable efforts, that "alternative procedures would have better minimized interception of noncriminal conversation while still permitting the government to achieve its legitimate objectives." United States v.Quintana, 508 F.2d at 875.
 2. The Reasonableness Standard
The United States Supreme Court has held that the minimization requirement "does not forbid the interception of all nonrelevant conversations, but rather instructs . . ." law enforcement to "minimize" the interception of nonrelevant conversations. Scottv. United States, 436 U.S. 128,140, 98 S.Ct. 1717, 1724,56 L.Ed.2d 168 (1978). The State is "held to a standard of honest effort; perfection is usually not attainable, and is certainly not legally required." United States v. Lopez, 300 F.3d 46, 58
(1st Cir. 2002); United States v. Uribe, 890 F.2d 554, 557
(1st Cir. 1989). The pertinent inquiry is the reasonableness of the interceptor's conduct in light of the facts and circumstances of each case. Scott, 436 U.S. at 140,98 S.Ct. at 1724, 56 L.Ed.2d 168; United States v. Hoffman,832 F.2d 1299, 1308 (1st Cir. 1987); United States v. Willis,890 F.2d 1099, 1101 (10th Cir. 1989). "Blind reliance on the percentage of non-pertinent calls intercepted is not a sure guide." Lopez,300 F.3d at 58 (quoting Scott). Statistics may provide assistance, but there are cases "where the percentage of non-pertinent calls is relatively high and yet their interception was still reasonable." Scott, 436 U.S. at 140,98 S.Ct. at 1724. The failure to minimize a high percentage of non-pertinent calls is reasonable, for example, where the calls are either short, one-time calls, or calls that are "ambiguous in nature or apparently involve guarded or coded language." Id.
Relevant factors to consider when examining the reasonableness of the State's minimization efforts are "the nature and complexity of the suspected crimes, the thoroughness of the [State's] precautions to bring about minimization, and the degree of judicial supervision over the surveillance process." UnitedStates v. Uribe, 890 F.2d at 557 (citing United States v.London, 66 F.3d 1227, 1236 (1st Cir. 1995)); see alsoUnited States v. Quintana, 508 F.2d 867, 874 (7th Cir. 1975) (citing same factors). "[W]hen an investigation is focusing on what is thought to be a widespread conspiracy, more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise." Scott, 436 U.S. at 140, 98 So. Ct. at 1724. This factor is particularly important when the wiretap is designed to identify unknown conspirators.Cleveland, 964 F. Supp. at 1093. When a conspiracy is of unknown proportions, there is a "`need to allow latitude to eavesdroppers . . . close to its zenith.' In such a case, the wiretap not only serves to `incriminate the known person whose phone is tapped, but to learn the identity of far-flung conspirators and delineate the contours of the conspiracy.'"United States v. Uribe, 890 F.2d at 557 (quoting Quintana,508 F.2d at 874 and Hoffman, 832 F.2d at 1308). Conversely, when an investigation is "focused on a finite, single criminal event, the investigation should be expected to be more narrow."Cleveland, 964 F. Supp. at 1093.
Another factor bearing on the reasonableness of the minimization is the type of telephone tapped. Scott,436 U.S. at 140, 98 S.Ct. at 1725. "The bugging of a private phone of a named target justifies broader surveillance than the bugging of a public phone." Cleveland, 964 F. Supp. at 1093 (citingScott).
In addition to weighing the above-discussed factors, which are largely objective, defendants Picerno and Oster urge this Court to further impose a subjective good faith requirement on the State. Defendants rely on the New Jersey Supreme Court case ofState v. Catania, 427 A.2d 537 (N.J. 1981). Although the United States Supreme Court specifically rejected imposing a subjective intent requirement for minimization in Scott, the Court inCatania chose to adopt a higher standard and require subjective good faith in addition to requiring that the State's minimization be objectively reasonable. See Catania, 427 A.2d at 544-551.
Given the facts of the instant case, however, this Court need not decide whether to adopt such a good faith requirement. The State's reasonable minimization, as discussed infra, was carried out in subjective good faith, regardless of whether such a requirement is dispositive. Furthermore, it is important to note that, although federal courts do not specifically require subjective good faith or consider it a dispositive factor, many courts seem to consider it nevertheless. See State v.Thompson, 191 Conn. 360, 370 (1983) (recognizing that federal courts permit inquiry into good faith as a relevant but not dispositive factor for reasonable minimization analysis);Uribe, 890 F.2d at 557 (government held to standard of "honest effort"). Perhaps this approach of requiring consideration of subjective good faith without making it a dispositive factor is the better approach; indeed, some already discussed factors, such as "honest effort" or "reasonable effort," at least impliedly include good faith. See Catania, 427 A.2d at 551 (all good faith requires is "reasonable efforts").[14]
 B. The State's Prima Facie Showing of Reasonableness
After applying the above factors to the instant case, this Court is satisfied that the State has made a prima facie
showing of reasonable minimization. This Court has carefully considered the arguments of all parties and thoroughly reviewed the voluminous record of affidavits, logs, weekly progress reports, statistical summaries, and other memoranda submitted by the parties.[15] Upon doing so, a number of factors lead to this conclusion.
 1. Tap of Personal Phone
First, the State's reasonable efforts to minimize its intrusion began with its decision as to which telephone to bug. SeeScott, 436 U.S. at 140, 98 S.Ct. at 1725; Cleveland,964 F. Supp. at 1093. By first tapping defendant Picerno's personal cellular telephone, the State already had minimized the danger of intercepting innocent conversations; it ensured that virtually every call involved at least one primary target of its investigation.[16] The tapping of a personal phone not generally used by third parties "goes a long way toward showing that the government was attempting to ensure that the number of non-pertinent conversations would be kept at a minimum."Cleveland, 964 F. Supp. at 1093-94; see also Scott,436 U.S. at 140, 98 S.Ct. at 1725 (type of phone monitored bears on reasonableness of minimization).[17]
 2. Precautions Undertaken
Second, the State's reasonable effort at minimization is evidenced by the extensive precautions it undertook to effectuate its obligation. See Uribe, 890 F.2d at 557 (listing factors for minimization determination). The Department of Attorney General required all State Police personnel assigned to monitor the interceptions to read a memorandum that it drafted entitled "Guidelines for Conducting Court-Authorized Wire Interceptions." The memorandum cited Rhode Island wiretap law and provided minimization instructions. Assistant Attorney General Stephen Dambruch held a minimization lecture at which he explained and reviewed the contents of the memorandum to officers assigned to monitor the wiretaps.
In addition, the Department of Attorney General made prosecutors available for consultation with the State Police and provided the State Police monitors with their contact telephone numbers. On several occasions, State Police monitors contacted and obtained minimization advice from Assistant Attorney General Patrick Youngs (who the Department designated to give advice on minimization of attorney-client communications) as well as prosecutor Dambruch. See States v. Torres, 908 F.2d 1417,1423 (9th Cir. 1990) (prosecutor availability and consultation for minimization advice is indicative of reasonable compliance). The State filed affidavits with this Court that catalogued the steps that it took to ensure minimization, attaching to the affidavits a copy of the memorandum circulated by the Department of the Attorney General and a listing of those officers who read the guidelines. The State's precautions are comparable to those taken in a number of cases that courts have found to be perse sufficient to establish a prima facie case of reasonable minimization. See, e.g., United States v. Villalpando, No. 94-50577, No. 94-50596, 1996 U.S. App. LEXIS 2956, at *10 (9th Cir. Feb. 5, 1996) (finding prima facie showing satisfied due to provision of memorandum, instructional classes, and availability of prosecutors for questions); United States v.Wright, 156 F. Supp.2d 1218, 1234 (D. Kan. 2001) (same);United States v. Villegas, No. 92-CR-699, U.S. Dist. LEXIS 18042, at *26 (S.D.N.Y. December 22, 1993) (same).
Additional efforts undertaken by the State Police, which have assisted this Court in assessing the minimization efforts, include their maintenance of detailed logs of each call. The call logs include the date, time, length of the call, a summary of the call's content, and whether the State Police minimized or spot-checked the call. The evident use of spot-checking by the State Police monitors is important. "Spot-checking" or "spot-monitoring" is a technique used by monitors to minimize the intrusion by intermittently monitoring calls that initially seem innocuous but later may turn criminal. United States v.Angiulo, 847 F.2d 956, 980 (1st Cir. 1988); United States v.Sorapuru, 902 F. Supp. 1322, 1330 (D. Colo. 1995). The officers' instruction in and actual use of spot-monitoring demonstrates reasonableness in minimizing calls; it helps to show an "honest effort."[18] Cleveland, 964 F. Supp. at 1093 (citingUnited States v. Torres, 908 F.2d 1417, 1423 (9th Cir. 1990));see also States v. Lopez, 300 F.3d 46, 58 (1st Cir. 2002) (state held to standard of honest effort).
 3. Judicial Supervision
Third, the extent of judicial supervision over the surveillance is further indicative of proper minimization efforts by the State. See United States v. Lopez, 300 F.3d 46, 58 (1st Cir. 2002) (degree of judicial supervision a factor for determining reasonableness of minimization efforts); United States v.Sorapuru, 902 F. Supp. 1322, 1229 (D. Colo. 1995) (same). As required by the wiretap order, the State Police submitted weekly minimization reports to the Presiding Justice. These reports were comprehensive, comprising ten volumes that totaled approximately 120 pages. The reports detailed the monitoring activity for each week, provided updates on the progress of the investigation, explained attorney-client interceptions and the efforts to minimize those conversations and quoted incriminating intercepts. The reports also listed persons who had engaged in potentially incriminating conversations and categorized the number of intercepted incriminating calls, non-incriminating calls, and miscellaneous calls. Such progress reports kept the Presiding Justice apprised of the ongoing investigation and, at the same time, allowed him to continually monitor the reasonableness of the State's minimization efforts. See United States v. Lopez, No. 99-79-P-C, 2000 U.S. Dist. LEXIS 8060, at *26-27 (D. Me. April 28, 2000). Such meaningful oversight not only lessened the danger of minimization abuses, but it is further evidence of the State's reasonable efforts to comply with its minimization obligation. See United States v. Hoffman, 832 F.2d 1299, 1308
(1st Cir. 1987) (weekly progress reports to court enhance reliability of minimization endeavors and afford evidence of good faith effort at compliance). "Where the [issuing] judge has required and reviewed such reports at frequent intervals, courts have been more willing to find a good-faith attempt to minimize unnecessary interceptions." United States v. Quintana,508 F.2d 867, 875 (7th Cir. 1975).
 4. Statistics
Finally, considering the circumstances of this case, minimization statistics further reveal that the State Police conscientiously carried out its obligation to minimize non-pertinent telephone calls. See Section V(A)(2) supra
(discussing reasonableness standard and latitude necessary to identify co-conspirators). The State has provided this Court with spreadsheets detailing pertinent statistics based on the call logs, including the number and percentage of miscellaneous non-conversations;[19] incriminating conversations; non-pertinent conversations overall; non-pertinent conversations under two minutes; non-pertinent conversations over two minutes; and minimized non-pertinent conversations over two minutes. To better assess the State's minimization efforts, the Court must examine these statistics and calculate the "relevant universe of calls." See, e.g., United States v. Willis, 890 F.2d 1099,1102 (10th Cir. 1989) (compiling call statistics); Sorapuru,902 F. Supp. at 1330 (D. Colo. 1995); United States v.Villegas, No. 92-CR-699, U.S. Dist. LEXIS 18042, at *25-26 (S.D.N.Y. December 22, 1993).
Over the course of the Sprint 113, Sprint 114, and Verizon 115 wiretaps, the State Police intercepted a total of 1,576 calls. If the Court subtracts the 723 miscellaneous non-conversations and the 163 pertinent conversations — neither of which need to be minimized — it is left with a total of 690 calls. See UnitedStates v. Willis, 890 F.2d at 1102; United States v. Wright,156 F. Supp.2d 1218, 1233 (D. Kan. 2001); R.I. Gen. Laws §12-5.1-5(b). If the Court further excludes the 462 non-pertinent conversations that lasted two minutes or less, it is left with a total of 228 non-pertinent conversations.[20] The call logs and the data compiled by the State show that of these 228 non-pertinent telephone calls, the monitors minimized 103 calls. Thus, the State succeeded in minimizing 45.2 % of the calls not subject to interception that were over two minutes. This minimization rate is well within the scope of reasonableness, particularly given the circumstances of this case.[21]See Section V(A)(2) supra (discussing reasonableness standard and latitude necessary to identify co-conspirators); see alsoUnited States v. Lamantia, No. 93-CR-523, 1996 U.S. Dist. LEXIS 14344, at *38-39 (N.D. Ill. September 17, 1996) (listing acceptable minimization rates in a number of cases).[22]
For all of these reasons, this Court finds that the State satisfied its prima facie burden. The State's reasonable efforts to comply with its obligation to minimize non-pertinent calls — given the nature and complexity of the suspected conspiracy — is evidenced by the tap of defendant Picerno's personal phone, the establishment and observation of precautionary procedures, the compliance with judicial supervision mandates, and the satisfactory minimization rate. The burden to show improper minimization thus shifts to the defendants.[23]
 C. The Defendants' Arguments
Once the State has satisfied its prima facie burden of showing reasonableness, the burden is on defendants Picerno and Oster to show that the State's efforts were unreasonable,Torres, 908 F.2d at 1423; Willis, 890 F.2d at 1102; that a substantial number of non-pertinent calls were intercepted unreasonably, Ianniello, 621 F. Supp. at 1470; that there was a pattern of unreasonable minimization, Uribe,890 F.2d at 557-58; Wright, 156 F. Supp.2d 1218, 1237; or that alternative procedures exist that the State could have utilized and still achieved its lawful objectives, Uribe,890 F.2d at 557-58; Wright, 156 F. Supp.2d 1218, 1237. To overcome these burdens, the defendants submitted their own list of 288 calls that they claim were not minimized and a list of 90 calls "where minimization involving `spot checking' was inappropriately utilized." The defendants divide these calls into categories of calls involving defendant Picerno's family members, friends, political associates, business associates, miscellaneous persons, and privileged conversations with defendant Picerno's spouse and attorneys.
 1. Failure to Overcome Burden
For two reasons, the defendants entirely fail to meet their burden to overcome the State's showing of good faith reasonable efforts to minimize. First, the defendants do not show that the State failed to minimize an unreasonable number of calls. Although the defendants submit their own list of 288 calls that they claim were not minimized, the record reflects that of these calls, 67 were incriminating, 129 were under two minutes, 2 were miscellaneous non-conversations, and 1 was minimized. Thus, the defendants have come forward with only 89 calls that arguably should have been minimized. Assuming the State was unreasonable in listening to each of the 89 calls, such a failure as a whole is not "unreasonable," "a substantial number," or representative of "a pattern" given the State's good faith showing and the circumstances of this case. See Torres, 908 F.2d at 1423;Willis, 890 F.2d at 1102; Uribe, 890 F.2d at 557-58;Wright, 156 F. Supp.2d 1218, 1237. The State intercepted a total of 1,576 calls over a three-month period. The investigation sought to explore a conspiracy of unknown proportions where the State knew neither the extent of its membership nor the precise scope of its activities. See Section V(A)(2) supra
(discussing latitude necessary for complex conspiracy investigations). Moreover, the defendants only suggest that the State breached its minimization obligation 6% of the time by improperly listening to 89 calls. Using this percentage, the State's 94% compliance rate is more than satisfactory. SeeUnited States v. Lopez, 300 F.3d 46, 58 (1st Cir. 2002) (honest effort required, not perfection); United States v.Uribe, 890 F.2d 554, 557 (1st Cir. 1989) (same).
Second, the defendants' categorization of calls that it claims were not minimized does not show a troubling pattern or otherwise exacerbate the State's failure to minimize — at least not under the circumstances of this case. Defendants argue that the State failed to minimize a number of calls between defendant Picerno and his attorneys, spouse, family, friends, political associates, and business associates. These categories, however, are the same categories of calls likely to include incriminating conversations. See Section IV(B)(1) supra (detailing, among other things, probable criminal activity involving defendant Picerno's family, political and business associates, friends, and attorneys). The State was justified, therefore, in relatively more, not less, intense surveillance of calls involving these categories of persons.
Perhaps, in some cases, such a repeated failure in these categories would prove that the State's minimization efforts were unreasonable. If the State were investigating defendant Picerno for a drug distribution conspiracy, for example, it may have been unreasonable for the State to fail to minimize as many calls involving family, attorneys, and political and business associates absent proper suspicion of their involvement. Yet, here, the State was investigating a bribery and extortion conspiracy in the Town government involving defendant Picerno, his associates, other town officials, and attorneys acquainted with Picerno.[24] Additionally, there was evidence of probable criminal involvement of Picerno's family members with mortgage and tax fraud, which the State believed to be connected to the public corruption. Under these circumstances, regarding the categories of calls cited by the defendants, the State Police officers "could reasonably have believed that the subject of the conversations might turn at any moment to criminal activities being investigated. . . ." United States v. Wilson,835 F.2d 1440, 1445-46 (D.C. Cir. 1987) (recognizing that conspirators often discuss personal and criminal matters in the same conversations). "Impractical forbearance" such as requiring the State "to plug its ears" after "X" number of minutes of seemingly innocent conversation, regardless of the circumstances, is not legally required, and it would create a "privileged sanctuary for illegal conversations." Id.
As for the 90 conversations that the defendants identify "where minimization involving `spot checking' was inappropriately utilized," the defendants offer no further explanation or evidence tending to suggest improper spot checking. This Court's review of the 90 calls listed by the defendants as involving "questionable minimization" does not reveal any failure great enough to rebut the State's good faith reasonable minimization efforts. Consequently, defendants Picerno and Oster have failed to meet their burden of showing that the State's minimization efforts were unreasonable, that a substantial number of non-pertinent calls were intercepted unreasonably, that there was a pattern of unreasonable minimization, or that alternative procedures exist that the State could have utilized and still achieved its lawful objectives. See Torres, 908 F.2d at 1423;Willis, 890 F.2d at 1102; Uribe, 890 F.2d at 557-58;Wright, 156 F. Supp.2d 1218, 1237.
 2. No Evidentiary Hearing Required
The defendants have requested an evidentiary hearing on the State's minimization efforts. For a number of reasons, no such hearing is necessary. First, courts generally refuse to hold a minimization hearing in situations such as the present "where the government makes a prima facie showing of compliance with the statute, and defendant fails to overcome that showing by demonstrating `that a substantial number of non-pertinent conversations have been intercepted unreasonably'. . . ." UnitedStates v. Wright, 156 F. Supp.2d 1218, 1234 (D. Kan. 2001) (quoting United States v. Pichardo, 1999 U.S. Dist. LEXIS 13111, 1999 WL 649020, at *17 (S.D.N.Y. Aug. 25, 1999)). Second, as with this case, courts are not required to hold an evidentiary hearing when affidavits, logs, and progress reports show sufficient minimization efforts. See, e.g., United States v.Cirillo, 499 F.2d 872, 880-81 (2d Cir. 1974); United States v.Losing, 539 F.2d 1174, 1180 (8th Cir. 1977); United States v.Cleveland, 964 F. Supp. 1073, 1101 (E.D. La. 1997); States v.Lamantia, No. 93-CR-523, 1996 U.S. Dist. LEXIS 14344, at *37 (N.D. Ill. September 17, 1996).
Finally, it seems from defendant Picerno's memoranda that defendants primarily seek such a hearing to determine whether the State carried out its minimization efforts with subjective good faith.[25] Even if subjective good faith is required, the factors already cited by this Court establish that the State's reasonable efforts to minimize were undertaken in good faith. As held by the Court in Catania, the case on which the defendants rely for imposing a subjective good faith requirement, good faith may be inferred from the monitors' actions and from other objective evidence. See State v. Catania, 427 A.2d 537,550-51 (N.J. 1981). Good faith is evident in this case by the fact that the State: (1) provided minimization instructions to the monitors; (2) required the monitors to sign a log to verify that they read the instructions; (3) actually minimized 103 non-pertinent calls; (4) provided extremely detailed progress reports to the Presiding Justice regarding the intercepts and its minimization efforts; (5) required prosecutors to be on-call to field minimization questions from the State Police monitors (including advice regarding minimization of attorney-client calls); and (6) actually provided such minimization advice to the State Police on a number of occasions. See id. Furthermore, the State's "spot monitoring is highly persuasive evidence of a good-faith intention on the part of the monitors to minimize."Id. at 551. Indeed, the defendants fail to identify any alternative procedures that the State Police could have employed to achieve better minimization while still permitting the State to achieve its lawful objectives. For these reasons, the State sufficiently complied with its statutory minimization obligation and no evidentiary hearing on the subject is required. attention.
 VI. DISCLOSURE
The next argument advanced by defendants Picerno and Oster in support of their motions to suppress the wiretap surveillance evidence poses yet another novel issue in this jurisdiction. The defendants contend that the State violated the provision of the Rhode Island Wiretap Statute concerning the disclosure of intercepted communications, R.I. Gen. Laws § 12-5.1-10, by filing a copy of its responses to defendants' discovery requests — which contained details of intercepted conversations — with this Court. The defendants complain that the filing of such disclosures, without a protective order, made the materials part of the public record and subjected them to embarrassing media attention.
Section 12-5.1-10 of the statute, entitled, "Disclosure and use of intercepted wire or oral communications," provides that:
 (a) Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire, electronic, or oral communication, or evidence derived from them, may disclose the contents to another investigative or law enforcement officer to the extent that disclosure is appropriate to the proper performance of the official duties of the officer making or receiving the disclosure.
 (b) Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire, electronic, or oral communication or evidence derived from them may use the contents to the extent that their use is appropriate to the proper performance of his or her official duties.
 (c) Any person who has received, by any means authorized by this chapter, any information concerning a wire, electronic, or oral communication, or evidence derived from them intercepted in accordance with the provisions of this chapter may disclose the contents of that communication or the derivative evidence while giving testimony under oath or affirmation in any criminal proceeding in any court of the United States or of this or any other state or in any federal or state grand jury proceeding.
 (d) No otherwise privileged wire, electronic, or oral communication intercepted in accordance with, or in violation of, the provisions of this chapter shall lose its privileged character.
R.I. Gen. Laws § 12-5.1-10 (emphasis added). The Rhode Island Supreme Court has held that "[s]ection 12-5.1-10 prohibits the disclosure of [wiretap] evidence except under certain enumerated circumstances and declares the privileged nature of such communications. . . ." State v. Ricci, 107 R.I. 582, 591,268 A.2d 692, 697 (1970). One of those enumerated circumstances in which disclosure of privileged communications is allowed is "[use by] an investigative or law enforcement officer . . . to the extent . . . disclosure is appropriate to the proper performance of his or her official duties." R.I. Gen. Laws § 12-5.1-10 (b). Yet this Court need not decide whether the prosecutors acted in the "proper performance" of their official duties in disclosing the wiretap evidence through discovery.[26] R.I. Gen. Laws § 12-5.1-10; see Resha v. United States, 767 F.2d 285,287-288 (6th Cir. 1985) (refraining from deciding whether disclosure was improper because suppression is not authorized). Assuming, arguendo, that the State violated the statute's disclosure prohibition, suppression of the evidence is not an available remedy.[27]
Indeed, nowhere in the Rhode Island Wiretap Statute does it indicate that suppression is a remedy for violations of the statute's prohibitions on the disclosure of electronic surveillance evidence. See R.I. Gen. Laws §§ 12-5.1-1 et.seq. The wiretap statute's suppression provision does not list improper disclosure as a basis for suppression.[28] Seeid. § 12-5.1-12. Another provision provides a civil remedy, but not suppression, for impermissible disclosure. Id. § 12-5.1-13. Moreover, the disclosure provision itself, § 12-5.1-10, does not contain a built-in suppression remedy — unlike the sealing provision of § 12-5.1-8(a) (discussed in Section VII infra).See id. § 12-5.1-10.
Further, federal courts confronting this issue in a similar context under the parallel disclosure provisions of the Federal Wiretap Statute, 18 U.S.C. § 2517, also have ruled that suppression is not an available remedy. See, e.g., UnitedStates v. Savaiano, 843 F.2d 1280, 1289 (10th 1988) (suit for damages, rather than suppression, is the exclusive remedy for unauthorized disclosures in violation of § 2517); Resha v.United States, 767 F.2d 285, 287-288 (6th Cir. 1985) (suppression of evidence not available for unauthorized disclosures in violation of § 2517); Fleming v. United States,547 F.2d 872, 874 (5th Cir. 1977) (same); United States v.Vento, 533 F.2d 838, 855 (3d Cir. 1976) (same). But seeUnited States v. Brodson, 528 F.2d 214, 215-16 (7th Cir. 1975) (improper disclosure to grand jury warrants dismissal of indictment). Consequently, this Court denies the defendants' motions to suppress the wiretap evidence on grounds of improper disclosure under the Rhode Island Wiretap Statute.
 VII. SEALING AND STORAGE
Defendants Picerno and Oster also seek to suppress the electronic surveillance evidence derived from the Sprint 114 and Verizon 115 wiretaps on the grounds that the State violated the sealing and storage provisions of the Rhode Island Wiretap Statute, R.I. Gen. Laws § 12-5.1-8(a). They seek an evidentiary hearing in connection with these motions. The State counters that the defendants' suppression motions fail as a matter of law.
 A. Background
The defendants do not dispute that the wiretap applications, affidavits and orders were sealed and stored in compliance with §12-5.1-8(b) of the Rhode Island Wiretap Statute. They likewise do not dispute that the recordings that comprise the Sprint 113 wiretap were sealed and stored in accordance with § 12-5.1-8(a) of the statute. The defendants presumably have no dispute regarding these issues because all of the seals that had been placed on these materials previously by the Presiding Justice and the prosecutor present at the time of sealing (inclusive of individual seals on each of the recordings from the Sprint 113 wiretap and the seal on the box containing those recordings) remained intact when counsel for all of the parties appeared before the Presiding Justice on October 3, 2003 for the State's requested unsealing of the wiretap materials.
The recordings that comprise the Sprint 114 and Verizon 115 wiretaps, however, stand on a different footing. At that same unsealing ceremony, the parties agree that the box containing these recordings had a broken seal. While they further agree that all of the individual recordings in the unsealed box had their seals intact, the defendants question whether all of the recordings that were placed in the box at the time of sealing were present in the box at the time of its unsealing and whether any other impermissible disclosure of or tampering with the evidence occurred after the seal was broken. The defendants apparently raised similar questions at the unsealing ceremony, prompting the Presiding Justice to indicate that they could go on the record to document any missing tape recording if any such evidence surfaced. No further proceedings occurred in that regard.
The State concedes that the Presiding Justice directed that it seal not only the individual tapes comprising the Sprint 114 and Verizon 115 wiretaps but also the box containing those recordings. The State further concedes that the Presiding Justice directed it to store the sealed tapes in the sealed box in a locked vault at Soverign Bank. While the State maintains that it complied with these directives with respect to all of the wiretap applications, affidavits and orders and with regard to the recordings that comprise the Sprint 113 wiretap, it admits that it did not seal and store the box of recordings from the Sprint 114 and Verizon 115 wiretaps in accordance with the directives of the Presiding Justice.[29] It has submitted affidavits that document and attempt to explain these failures; they suggest that the box never made it to the bank vault because the vault was full, the box was stored under a desk at the Attorney General's Office and that sometime thereafter, for unstated reasons, the seal was broken.
In seeking to suppress all of the electronic surveillance from the Sprint 114 and Verizon 115 wiretaps under § 12-5.1-8(a) of the statute, the defendants argue that the recordings that comprise those wiretaps were made available to the Presiding Justice and sealed under his direction. According to the defendants, the sealing of the recordings that was done at his direction included, for purposes of the statute, not only the sealing of each of the individual tape recordings but also the sealing of the box in which all of the individual tape recordings were stored. As such, the defendants argue that, as a predicate to using those recordings at trial, the State must prove that the seals provided for by the statute (namely the seals that were placed originally on all of the individual tapes in the box as well as the seal on the box) were present at the time of unsealing, or that there is a satisfactory explanation for the absence of any seals. Without such proof, the defendants contend that any use or disclosure of the recordings from the unsealed box is barred by the statute. They make a similar argument with respect to storage of the box. As noted previously, the defendants seek an evidentiary hearing with respect to these alleged statutory violations.
The State responds that, as a matter of law, the Rhode Island Wiretap Statute, R.I. Gen. Laws § 12-5.1-1 et seq., does not provide for suppression as a remedy for such a claimed sealing or storage violation. According to the State, the exclusive provision of the statute providing for suppression of evidence is § 12-5.1-12(a) and that provision allows for suppression only with regard to applications and orders that are not sealed in conformance with the statute as opposed to recordings that are not sealed properly. Alternatively, the State argues that, even assuming that § 12-5.1-8(a) prohibits the use or disclosure of the contents of recordings that are not properly sealed in accordance with the statute, it did not violate that sealing provision because it sealed the individual recordings in the box, all of those recordings remain sealed, and the statute does not mandate the sealing of the box itself.
 B. Consequence of a Section 12-5.1-8(a) Sealing Violation
The sealing and storage requirements with respect to wiretap applications, affidavits and orders are set forth in §12-5.1-8(b) of the Rhode Island Wiretap Statute:
 Applications made and orders granted under this chapter shall be sealed by the presiding justice of the Superior Court. Custody of the applications and orders shall be wherever the presiding justice of the Superior Court directs.
R.I. Gen. Laws § 12-5.1-8(b). This statutory provision thus mandates that wiretap applications, the affidavits that the applications incorporate by reference, and any orders issued by the Presiding Justice with respect to those applications be sealed by the Presiding Justice. Id. Once sealed, the statute mandates that the custody of those wiretap materials be wherever the Presiding Justice directs. Id. The purpose of these statutory requirements is to ensure the confidentiality of the wiretap investigation and the integrity of the applications, affidavits and orders that ultimately may be challenged for lack of probable cause or necessity. State v. Campbell,528 A.2d 321, 328 (R.I. 1987).
Under § 12-5.1-12(a) of the statute, a failure to comply with the sealing provisions of § 12-5.1-8(b) may result in the suppression of the electronic surveillance evidence. Id. §12-5.1-12(a). Section 12-5.1-12(a) provides as follows:
 (a) Any aggrieved person may move to suppress the contents of any intercepted wire, electronic or oral communication or evidence derived from them on the grounds that:
* * *
 (5) The seal provided in § 12-5.1-8(b) is not present and there is no satisfactory explanation for its absence.
Id.
The statute contains a further provision regarding the sealing and storage of the audiotape recordings of communications that are intercepted pursuant to a wiretap authorization order of the Presiding Justice. It provides, in pertinent part, as follows:
 The contents of any wire, electronic, or oral communication intercepted by means authorized by this chapter shall, if practicable, be recorded on tape or wire or other comparable device. The recording of the contents of any wire, electronic, or oral communication under this section shall be done in such a way as will protect the recording from editing or other alterations. Immediately upon the expiration of the period of the order, or extensions of the order, the recordings shall be made available to the presiding justice of the superior court issuing the order and sealed under his or her direction. Custody of the recordings shall be wherever the presiding justice of the superior court orders. They shall not be destroyed except upon an order of the presiding justice of the superior court, and in any event, shall be kept for ten (10) years. Duplicate recordings may be made for use or disclosure pursuant to the provisions of § 12-5.1-10(a) or (b) for investigations and bail hearings and pre-trial hearings. The presence of the seal provided by this section, or a satisfactory explanation for its absence, shall be a prerequisite for the use and disclosure of the contents of any wire, electronic, or oral communication or evidence derived therefrom at any bail or pre-trial hearing.
Id. § 12-5.1-8(a) (emphasis added).
A violation of the requirements of this provision of the statute, unlike a violation of the sealing requirement applicable to wiretap applications, affidavits and orders under §12-5.1-8(b), does not give rise to suppression under §12-5.1-12(a). Id. Instead, the final sentence of § 12-5.1-8(a), regarding sealing and storage of the wiretap recordings, provides its own "suppression" language, as follows:
 The presence of the seal provided by this section, or a satisfactory explanation for its absence, shall be a prerequisite for the use and disclosure of the contents of any wire, electronic, or oral communication or evidence derived therefrom at any bail or pre-trial hearing.
Id. (emphasis added). This provision addresses only a failure to comply with the sealing requirements of § 12-5.1-8(a); it imposes no restriction on the use and disclosure of wiretap recordings that are not stored in accordance with the statute.Id. Section 12-5.1-8(c) nonetheless provides that any violation of § 12-5.1-8 (inclusive of violations of § 12-5.1-8(b) regarding the sealing and storage of wiretap applications, affidavits and orders and violations of § 12-5.1-8(a) regarding the sealing and storage of wiretap recordings) "may be punished as contempt of the presiding justice of the superior court." Id. §12-5.1-8(c).
In addressing the parties' arguments, this Court first must determine, as an issue of first impression, whether the Rhode Island Wiretap Statute provides for suppression of evidence as a remedy for a violation of the sealing provisions of §12-5.1-8(a), assuming that such a violation can be proven. This determination requires this Court to examine and construe two relevant provisions of the statute: § 12.5-1-12(a) (entitled "Suppression of evidence") and § 12-5.1-8(a) (entitled "Maintenance and custody of records").
In interpreting these provisions, this Court is guided by settled precepts of statutory construction. Statutes should be read to give effect to every word or phrase. State v.DeMagistras, 714 A.2d 567 (R.I. 1998). The canons of statutory construction will not ascribe to the legislature an intention to enact provisions that are devoid of purpose or effect. State v.Ricci, 533 A.2d 844 (R.I. 1987). Where there are two apparently inconsistent provisions in a statute, an effort should be made to construe and apply them as consistent. Brennan v. Kirby,529 A.2d 633 (R.I. 1987). Statutes in pari materia should be construed together so they may be harmonized. State v.Ahmadjian, 438 A.2d 1070 (R.I. 1981).
There is no question that § 12-5.1-12(a) expressly provides for suppression as a remedy for a violation of the sealing requirements of § 12-5.1-8(b) (that concern the sealing of affidavits and orders). R.I. Gen. Laws § 12-5.1-12(a)(5). It also provides for suppression as a remedy if:
 (1) the communication was unlawfully intercepted; (2) the order under which it was intercepted is insufficient on its face; (3) the interception was not made in conformity with the order; and (4) service was not made as provided in § 12-5.1-11. . . .
Id. § 12-5.1-12(a)(1)-(4). A violation of the sealing requirements of § 12-5.1-8(a), however, is conspicuously absent from the listed grounds warranting suppression under §12-5.1-12(a)(1)-(5).
Yet the language of § 12-5.1-8(a) itself prohibits the use or disclosure of wiretap evidence where there has been a statutory sealing violation. While not speaking in terms of the suppression of evidence per se, it nonetheless prohibits the use or disclosure of the contents of any wire, electronic or oral communication if the seal provided for in § 12-5.1-8(a) is not present or if the State fails to give a satisfactory explanation for its absence. Id. § 12-5.1-8(a). Such a prohibition on use and disclosure of evidence is tantamount to its suppression.
It appears to this Court, therefore, that the provisions of §12-5.1-8(a) and § 12-5.1-12(a) can be harmonized. Section12-5.1-12(a) provides for suppression of evidence on a motion filed by an aggrieved party when "there is a failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures. . . ." United State v. Mora,821 F.2d 860, 865 (1st Cir. 1987) (quoting United States v.Giordano, 416 U.S. 505, 527, 40 L.Ed.2d 341, 94 S.Ct. 1820
(1974)). All of the grounds for suppression under that provision concern the legality of the surveillance in the first instance.Id.
Section 12-5.1-8(a), on the other hand, concerns the handling of the electronic surveillance pursuant to a lawfully authorized wiretap once the wiretap order has expired. The remedy of "suppression" that it provides is thus independent of and in addition to the suppression remedy provided by § 12-5.1-12(a).
This Court's view of the interplay of these statutory provisions comports with settled precepts of statutory construction that encourage harmonization. If this Court were to construe § 12-5.1-12(a) as containing the finite list of grounds for suppression under the statute, as the State argues, such construction would be tantamount to reading the "suppression" language of § 12-5.1-8(a) out of the statute. It would suggest impermissibly that such language is mere surplusage that the legislature did not intend to have any effect.
Moreover, this Court's interpretation of the statute mirrors that reflected in the decisions of federal courts that have interpreted the provisions of the Federal Wiretap Statute,18 U.S.C. § 2518(a) and 2518 (10)(a), that are identical to the provisions of our state statute. See United States v. DjedaRios, 495 U.S. 257, 264-67, 110 U.s. S.Ct. 1845, 1847-51,109 L.Ed.2d 224, 235-36 (1990); United States v. Mora,821 F.2d 860, 863-71 (1st Cir. 1987).[30] In Mora, the First Circuit established that proof of untimely or absent seals, without justification, under § 2518(8)(a) of the Federal Wiretap Statute provides an independent ground for suppression, despite the absence of such a basis under the explicit suppression provision of the federal statute, 18 U.S.C. § 2518 (10)(a), that parallels § 12-5.1-12(a) of our state statute. See Mora,821 F.2d at 865-66. The Court in Mora reasoned that the "prerequisite" language of the sealing provision is a built-in, custom-tailored suppression remedy. Id.
Not only does this Court find this reasoning persuasive and applicable to the present issue under Rhode Island's essentially duplicate provision, but established preemption principles demand such a finding. Even if the Rhode Island statute were somewhat distinguishable — which it is not — and a remedy short of suppression were arguably available under the Rhode Island statute, this Court is bound to follow the federal directive and find that a statutory sealing violation can be a basis for suppression. As held by the Rhode Island Supreme Court, the federal wiretap statute "has preempted the field in wiretap and established minimum standards for the admissibility of evidence procured through electronic or mechanical eavesdropping."Pulawski v. Blais, 506 A.2d 76, 76-77 (R.I. 1986). The scope of the federal wiretap statute's authority extends to both state and federal courts. Id. at 77. As cited in Pulawski,18 U.S.C. § 2515 provides:
 Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.
See Pulawski v. Blais, 506 A.2d 76, 76-77 (R.I. 1986);18 U.S.C. § 2515. "Generally speaking, insofar as wiretapping is concerned, states are free to superimpose more rigorous requirements upon those mandated by Congress, but not to water down federally-devised safeguards." Mora, 821 F.2d at 863 n. 3 (ignoring potential conflict with Massachusetts's less demanding sealing requirement).
For all of these reasons, this Court applies the directives ofMora, 821 F.2d at 865-66, and concludes that "a case within [the] ambit of § 12-5.1-8(a) affords a freestanding basis for suppression, independent of [§ 12-5.1-12]. Mora,821 F.2d at 866. As such, this Court rejects the State's argument that the remedy of suppression of evidence is not available, as a matter of law, for a violation of the sealing provisions of §12-5.1-8(a).
 B. Question of the Existence of a Sealing Violation under Section 12-5.1-8(a)
The next question, therefore, is whether the State violated the sealing requirements of § 12-5.1-8(a) with respect to the tape recordings that comprise the Sprint 114 and Verizon 115 wiretaps such that suppression of the contents of those recordings is mandated under the Rhode Island Wiretap Statute. To answer this question, this Court is faced with several issues that present mixed questions of fact and law: (1) whether all of the recordings in those wiretaps were made available to the Presiding Justice and sealed and stored under his direction, within the meaning of the statute; and (2) whether the seals provided for in the statute were present at the time of unsealing; and (3) if not, whether the State can provide a satisfactory explanation for their absence.
In an attempt to address these questions, the State presented affidavits and the parties briefed the legal issues. Notwithstanding the State's filing of affidavits, the defendants seek an evidentiary hearing.
Having considered all of these materials, this Court is of the view that it cannot properly determine whether the State violated § 12-5.1-8(a) and make the requisite findings of fact in that regard without an evidentiary hearing.[31] Evidentiary hearings are the usual prerequisite to courts making factual findings under § 12-5.1-8(a), determining the existence of any sealing violations and determining the appropriate remedy for any such violation. See, e.g., Ojeda Rios, 495 U.S. at 264-67;Mora, 821 F.2d at 865-71; United States v. Anguilo,847 F.2d 956 (1st Cir. 1988).
 VIII. CONCLUSION
For the reasons set forth in this decision, this Court denies the defendants' motions to suppress the electronic surveillance evidence to the extent that those motions are based on claims that the State violated the Rhode Island Wiretap Statute, R.I. Gen. Laws §§ 12-5.1-1 et seq., by (1) failing to establish probable cause and necessity for the authorized interceptions; (2) failing to properly minimize the interception of non-pertinent conversations during execution of the wiretap orders; and (3) disclosing the wiretap evidence through the process of discovery in the criminal case. To the extent that those motions are premised on claims that the State violated the sealing and storage provisions of the statute, R.I. Gen. Laws §12-5.1-8(a), this Court holds that the statute allows for suppression as a remedy for such a violation but reserves decision as to whether the State violated those provisions of the statute, so as to warrant suppression, pending an evidentiary hearing.
Counsel are directed to submit to this Court forthwith for entry an agreed upon form of order that is reflective of this decision and provides for the prompt scheduling of an evidentiary hearing.
[1] The State of Rhode Island has charged defendant Robert Picerno, a former member of the Lincoln Planning Board, with four counts of accepting, agreeing to accept and/or attempting to obtain a bribe and three counts of conspiracy to commit those same offenses in violation of R.I. Gen. Laws §§ 11-7-3 and 11-1-6
(1956). The State of Rhode Island has charged defendant Jonathan Oster, former Lincoln Town Administrator, with two counts of accepting, agreeing to accept and/or attempting to obtain a bribe and two counts of conspiracy to commit those same offenses in violation of R.I. Gen. Laws §§ 11-7-3 and 11-1-6 (1956). This Court has severed the trials of the co-defendants; defendant Picerno's trial will precede defendant Oster's trial. Notwithstanding the trial severance, the parties agreed and this Court allowed these pre-trial suppression motions to be heard jointly by the Court.
[2] Substantive portions of this application and affidavit, as well as those filed subsequently by the State, will be discussed in greater detail as they pertain to the defendants' arguments regarding probable cause and necessity.
[3] It is not clear to this Court why the State numbered the wiretaps "113", "114", and "115."
[4] For additional facts and circumstances surrounding defendant Picerno's arrest and subsequent cooperation with the State Police, see State v. Picerno, C.A. No. P1-02-3047B, 2004 R.I. Super. LEXIS 33 (Jan. 30, 2004) (decision on defendant Picerno's motion to suppress statements and tangible evidence).
[5] R.I. Gen. Laws § 12-5.1-12(c) provides that
 [i]f the motion [to suppress wiretap evidence] shall be made before any court or judge other than the presiding justice of the superior court, the motion shall be transferred to the presiding justice of the superior court or to an associate justice of the superior court who shall be designated by the presiding justice . . . for hearing and determination. . . .
[6] See Section V infra (discussing burden of production in minimization cases).
[7] The Rhode Island Supreme Court has insisted on strict compliance with respect to § 12-5.1-5 of the Rhode Island Wiretap Statute (form and content of orders). See State v. Sitko,460 A.2d at 1, 3 (1983); State v. Luther, 116 R.I. at 28, 29,351 A.2d at 594, 595 (1976); State v. Maloof, 114 R.I. 380,333 A.2d 676 (1975). It also has invoked the strict compliance standard originally formulated in Maloof when considering the issue of necessity under R.I. Gen. Laws § 12-5.1-4(a)(3), seeState v. Ahmadjian, 438 A.2d 1070, 1083 (R.I. 1981), and the definition of "intercepting device" under R.I. Gen. Laws §12-5.1-1(8), see State v. O'Brien, 774 A.2d 89, 100 (R.I. 2001).
[8] Defendants Picerno and Oster also have filed motions adopting each other's arguments.
[9] One caveat: as explained below, in Section VII (Sealing and Storage), an issue remains, pending an evidentiary hearing, as to whether the State violated the sealing and storage provisions of the Rhode Island Wiretap Statute, R.I. Gen Laws § 12-5.1-8(a), so as to warrant suppression. Nevertheless, this Court need not decide defendant Oster's standing for the purposes of this decision.
[10] The Court reiterates that, for the purposes of this motion, it is accepting the information contained in the wiretap application and affidavit as factually accurate. "A court reviewing the viability of a decision to authorize a wiretap warrant is required `to examine the face of the affidavit and decide if the facts set forth in the application were minimally adequate to support the determination that was made.'" UnitedStates v. Montegio, 274 F. Supp.2d 190, 197-98 (D.R.I. 2003) (citing United States v. Nelson-Rodriguez, 319 F.3d 12, 32 (1st Cir. 2003)).
[11] If this Court were to determine that the initial wiretap authorization lacked probable cause, then the parties agree that communications intercepted in later wiretap authorizations that the State obtained, at least in part, based on evidence from the first wiretap authorization would have to be suppressed as poisonous fruit. See United States v. Giordano, 416 U.S. 505,529-32, 94 S.Ct. 1820, 1833-34, 40 L.Ed.2d 341, 361-63 (1974). Absent that determination, the facts that support a finding of probable cause in an initial wiretap authorization, when combined with pertinent evidence gleaned from that authorized wire interception, serve to make an even stronger showing of probable cause as to a subsequent wiretap application.
[12] A "front man" is defined as "a person serving as a front or figurehead. . . ." A "front" is defined as "a person, group, or thing used to mask the identity or true character or activity of the actual controlling agent. . . ." Merriam Webster'sCollegiate Dictionary 468-69 (10th ed. 1993). The affidavit explains that "Campo Industries" would be incorporated to own the H H Screw property, with 50-50 ownership by Donald Lembo and David Wayne Daniel. Defendant Picerno's interest was to be held through Lembo. The State is unsure as to the interests of other conspirators. Lembo is the attorney alleged to have intended to prepare the legal documents.
[13] 18 U.S.C. § 2518(5) provides that:
 [e]very order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter
(18 U.S.C. § 2510 et seq.), and must terminate upon attainment of the authorized objective, or in any event in thirty days.
(Emphasis added.)
[14] Moreover, good faith may be inferred from objective indicia of reasonableness, which are herein discussed, such as the State's provision of minimization instructions to monitors, actual termination of non-pertinent calls, and use of spot-monitoring. Catania, 427 A.2d at 550-51.
[15] At a hearing on January 15, 2004, the parties in the instant case agreed to a sequence of briefing following the above-discussed burdens. To satisfactorily raise a minimization challenge, the Court asked defendants to particularize their blanket motions to suppress for failure to minimize by submitting memoranda listing calls that they allege were not properly minimized. Defendants provided such a list on January 16, 2004. The State, then being burdened with establishing a primafacie case of compliance with its minimization obligations, submitted a memorandum in an effort to meet this burden on January 20, 2004. On January 28, 2004, defendants responded with specific arguments as to why the State's minimization efforts were insufficient. Lastly, the State submitted a reply memorandum on February 4, 2002 that responds to defendants' specific arguments.
As explained at the January 15, 2004 hearing, the Court's request that the defendants initially specify allegedly improperly minimized calls was not an effort to burden the defendants with establishing a prima facie case of insufficient minimization, and the Court's review of defendants' motions is certainly not premised on such an assumption.Compare United States v. Giacalone, 853 F.2 470, 482 (6th Cir. 1988); United States v. Grubet, 994 F. Supp. 1026, 1048 (D. Iowa 1998). Rather, the Court asked that the defendants particularize their blanket challenges of improper minimization to ensure that their motions to suppress for an alleged failure to minimize were sufficiently specific to raise a minimization challenge. See State v. DeWolfe, 121 R.I. 676, 402 A.2d 740
(1979) (moving papers should allege facts with sufficient definiteness, clarity and specificity to enable the trial court to conclude that relief must be granted if the facts alleged are proven).
[16] The State subsequently sought authorization to tap defendant Picerno's home telephone, which became the Verizon 115 wiretap. As indicated in the corresponding wiretap application, the State sought such authorization after gaps developed in incriminating conversations because defendant Picerno sometimes would switch to using his home telephone.
[17] The tapping of a personal phone of a primary suspect by law enforcement also dilutes the percentage of calls minimized because it is reasonable to listen to more calls. See Scott,436 U.S. at 140, 98 S.Ct. at 1725; Cleveland,964 F. Supp. at 1093-94.
[18] In the wiretap authorizations, the Presiding Justice ordered the State Police to use spot-monitoring to effectuate minimization.
[19] Miscellaneous non-conversations include "no connects, misdial/wrong numbers, fax transmissions, and voice messages." Such calls need not be minimized. United States v. Willis,890 F.2d 1099, 1102 (10th Cir. 1989).
[20] When considering such statistics, courts draw a line at the two or three minute mark and exclude such short-duration calls from consideration. United States v. Lamantia, No. 93-CR-523, 1996 U.S. Dist. LEXIS 14344, at *38 (N.D. Ill. September 17, 1996) ("calls less than two or three minutes in duration are too short to minimize"); see also, e.g.,United States v. Willis, 890 F.2d 1099, 1102 (10th Cir. 1989) (excluding calls lasting less than two minutes); Villegas, at *25 ("Second Circuit has held that calls lasting less than two minutes need not be minimized"); United States v. Cleveland,964 F. Supp. 1073, 1092 (E.D. La. 1997) (excluding calls less than three minutes in duration). The rationale is that "even a seasoned listener would have been hard pressed to determine with any precision the relevancy of many of the calls before they were completed." Scott, 436 U.S. at 142, 98 S.Ct. at 1725. "It is often impossible to determine that a particular telephone conversation would be irrelevant and harmless until it has been terminated. . . . "[M]onitoring agents are not gifted with prescience and cannot be expected to know in advance what direction the conversation will take." United States v. Wilson,835 F.2d 1440, 1446 (D.C. Cir. 1987) (internal quotes and citations omitted).
[21] Note that this minimization rate is a more conservative figure, as the State calculated it by using a two minute cut-off mark rather than the permitted three minute cut-off mark. The minimization rate would be even higher if all calls less than three minutes were excluded from consideration. Such a three-minute cutoff mark may not be unreasonable given the complexity and unknown proportions of the conspiracy. SeeUnited States v. Cleveland, 964 F. Supp. 1073, 1094 n. 10 (E.D. La. 1997) (collecting cases using a three minute cut-off rate).
[22] The Court in Lamantia catalogs the minimization rates found in a host of cases:
 See, e.g., Ozar, 50 F.3d at 1447-48 (57% minimization rate was not unreasonable given the complexity of the investigation and the court's continuing supervision); Clark, 1995 WL 453258 at *6 (28% minimization rate not unreasonable when 65% of the non-pertinent, non-minimized calls lasted less than two minutes); United States v. Smith, 909 F.2d 1164, 1166 (8th Cir. 1990) (30% minimization rate not unreasonable when agents were provided with minimization guidelines); Willis, 890 F.2d at 1102
(70% minimization rate); United States v. Wilson, 266 U.S.App.D.C. 344, 835 F.2d 1440, 1446 (D.C. Cir. 1987) (16% minimization rate); United States v. Apodaca, 820 F.2d 348, 350 n. 3 (10th Cir. 1987) (17% minimization rate after incomplete and short calls and calls to pager service subtracted); United States v. Costello, 610 F. Supp. 1450, 1476 (N.D. Ill. 1985) (80% minimization rate) . . . Suquet, 547 F. Supp. at 1044-46 (69% minimization rate).
United States v. Lamantia, No. 93-CR-523, 1996 U.S. Dist. LEXIS 14344, at *38-39 (N.D. Ill. Sept. 17, 1996).
[23] Although the defendants asked for an evidentiary hearing on the State's minimization efforts, such a hearing is not necessary. See Section V(C)(2) infra (explaining reasons why an evidentiary hearing is not necessary in this case).
[24] Indeed, the Court finds it baffling that the defendants can argue in good faith that the State unreasonably intercepted calls involving defendant Picerno's political associates, as the State was investigating the defendant and others for public corruption.
[25] Defendant Picerno questioned whether any instructions were given to monitors and what steps were taken to ensure that monitors were aware of the instructions; these questions were answered by the State in its prima facie case.
[26] The State argues that, even assuming that its prosecutors are subject to the statute's disclosure prohibitions, their disclosure was in the proper performance of their duties because filing discovery responses with the Court is a longstanding practice of the Department of Attorney General and is intended to show compliance with Rule 16 should a defendant later allege that the State violated its discovery obligations. The State also maintains that the defendants, having asked for such materials and knowing the State's practices, cannot now allege improper disclosure because they failed to seek a protective order with respect to the State's discovery responses, as allowed by Rule 16.
[27] Although not deciding whether the State's conduct violated § 12-5.1-10, this Court finds, contrary to the State's position, that assistant attorneys general are within the class of persons prohibited from making unauthorized disclosures under the statute. The State argues disingenuously that assistant attorneys general are not within the scope of § 12-5.1-10 because that statutory provision only prohibits "investigative or law enforcement officer[s]" from making unauthorized disclosures. Yet, § 12-5.1-1 unambiguously defines "investigative or law enforcement officer" as including "the attorney general, and his or her assistants." Under the statute, it certainly would be prudent, if not legally required, for the State to request a protective order under Rule 16, as it is permitted to do, in connection with its filing of privileged discovery materials with the Court should the defendant fail to request such an order in the first instance. In that way, it can meet its Rule 16 discovery obligations while not running afoul of the disclosure prohibitions of the Rhode Island Wiretap Statute. In addition, the defendant's right to a fair trial can be protected pending the court's determination of any questions of privilege and public access to privileged documents.
[28] At the January 14, 2004 hearing, defendant Picerno argued that § 12-5.1-12(a)(3) provides for suppression for improper disclosures. This section enumerates a ground for suppression where the "interception was not made in conformity with the order." R.I. Gen. Laws § 12-5.1-12(a)(3). This Court rejects this argument because the State's disclosure pertained to previously intercepted evidence and was not related to the "interception" itself.
[29] In each of the written orders of the Presiding Justice that authorized the requested wiretaps, the Presiding Justice ordered that the underlying applications and the order itself "shall be sealed by the Presiding Justice and shall be retained in a safe deposit box in a bank in the City of Providence, Rhode Island at his direction." The orders are otherwise silent as to the sealing and storage of the recordings of calls intercepted pursuant to the orders. This Court has not been presented with any written orders regarding the sealing and storage of the recordings. Nonetheless, the parties appear to agree that the Presiding Justice issued the aforementioned directives with regard to their sealing and storage.
[30] The Rhode Island Supreme Court recognizes that §12-5.1-8(a) "essentially duplicates the federal provision."State v. Campbell, 528 A.2d 321, 329 n. 11 (R.I. 1987). Indeed, both the state and federal provisions require the recordings to be "made available to the [issuing judge] . . . and sealed under his [or her] directions." Compare R.I. Gen. Laws § 12-5.1-8(a)with 18 U.S.C. § 2518(8)(a). Both sections further provide that the presence of the seal provided for by this [subsection], or a satisfactory explanation for [the absence thereof], shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication. . . ." Id. In addition, both the federal and state statutes provide for suppression of evidence on grounds that do not include a violation of the sealing requirements applicable to the recordings themselves. Compare R.I. Gen. Laws § 12-5.1-12(a)with 18 U.S.C. § 2518(10)(a).
[31] Such a hearing will allow the parties to present evidence regarding the sealing and storage of the recordings in the Sprint 114 and Verizon 115 wiretaps that may include: the nature of the wiretap evidence that the State presented initially to the Presiding Justice for sealing; the circumstances attending its presentation; the Presiding Justice's directions regarding the sealing and storage of the recordings (including the tapes and the boxes in which the tapes were to be stored); the purpose of those directives; the execution of those directives; the explanation for and effect of any failure to seal and store the tapes in accordance with those directives; the handling of the recordings after any failure to seal; the nature of the wiretap evidence that was present at the time of unsealing (as compared with that evidence presented at the initial sealing); and the circumstances attending the unsealing ceremony. Such evidence may address whether the integrity of the tapes has been compromised, whether the prosecution benefited from or the defendants were prejudiced by any sealing and storage violations, and whether any sealing and storage violations can be explained and were deliberate or inadvertent. See Ojeda Rios,495 U.S. at 264-67; Mora, 821 F.2d at 865-71.